Filed 5/23/22 P. v. McGhee CA2/8
(opinion on transfer from Supreme Court)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B265136 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA071844) |
| v. | |
| DIAMONTE JEROME MCGHEE et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, David B. Gelfound, Judge. Affirmed in part, reversed in part and remanded with directions.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Eric Michael Edwards.

H. Russell Halpern for Defendant and Appellant Diamonte Jerome McGhee.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Susan Sullivan Pithey, Assistant

Attorney General, Shawn McGahey Webb, Idan Ivri, Amanda V. Lopez and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

In 2014, defendants Diamonte Jerome McGhee and Eric Michael Edwards were convicted by jury on numerous counts, including special circumstance murder, attempted murder, assault with a firearm, and robbery.  In our original decision filed March 16, 2017, we affirmed their convictions based on the law that existed at that time.

Defendant Edwards petitioned our Supreme Court for review.  Defendant McGhee did not seek review.  On April 10, 2019, the Supreme Court transferred the matter back to this court with directions to vacate our decision in its entirety and reconsider the cause in light of the passage of Senate Bill 1437 (2017–2018 Reg. Sess.).

As originally enacted, Senate Bill 1437 amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

Senate Bill 1437 also added Penal Code section 1170.95 which set forth a procedure whereby a "person convicted of felony murder or murder under a natural and probable consequences

theory" could petition for resentencing relief. (Former § 1170.95, subd. (a).)

In an unpublished decision, we again affirmed McGhee's conviction. We also affirmed Edwards's conviction, concluding the changes effected by Senate Bill 1437 did not apply to attempted murder, nor was Edwards entitled to raise a Senate Bill 1437 challenge on direct appeal. (*People v. McGhee* (Aug. 15, 2019, B265136) [nonpub. opn.].)

Edwards filed another petition in the Supreme Court. In October 2021, while this case was pending in the Supreme Court, the Legislature passed Senate Bill 775 (2021–2022 Reg. Sess.) which, among other things, amended the language of Penal Code section 1170.95 by expanding the scope of the resentencing provision to include individuals who had been convicted of attempted murder under a natural and probable consequences theory. (Stats. 2021, ch. 551, § 2.) Senate Bill 775 also amended the statute to expressly provide that relief may be sought on direct appeal. Section 1170. 95, subdivision (g) now provides that "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437."

On February 16, 2022, the Supreme Court transferred the matter back to this court with directions to vacate our opinion and reconsider the cause in light of Senate Bill 775. Edwards and the Attorney General's office filed supplemental briefs.

Having vacated our entire opinion again, we address below the issues raised by both defendants. As to defendant McGhee, who did not petition for review, we again affirm the judgment of conviction. As to defendant Edwards, we reverse his convictions

for murder and attempted murder (counts 1, 2, 3, 12 & 17), vacate the special-circumstance finding and firearm enhancements associated with those counts, and otherwise affirm the judgment.

## PROCEDURAL SUMMARY

McGhee, Edwards, and a third defendant, Branden Trevaughn Higgs (collectively defendants), were charged with numerous offenses arising from separate events that occurred on two different days in October 2011. Higgs is not a party to this appeal.

For the events that occurred on October 29, 2011, McGhee and Edwards were charged with one count of attempted premeditated murder (Pen. Code, §§ 187, subd. (a), 664; count 6) and six counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 7–11, 16).

For the events that occurred on October 31, 2011, all three defendants were charged with one count of murder (Pen. Code, § 187, subd. (a)) with a special circumstance allegation the murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17); count 1), four counts of attempted premeditated murder (§§ 187, subd. (a), 664; counts 2, 3, 12, 17), four counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 13, 14, 15, 18), conspiracy to commit robbery (§ 182, subd. (a)(1); count 4), and second degree robbery (§ 211; count 5).

Various firearm allegations were alleged. (Pen. Code, §§ 12022, subd. (a)(1), 12022.5, 12022.7, subd. (a), 12022.53, subds. (b)–(d).) As to Edwards and Higgs, it was alleged that a principal used a firearm in the commission of the offenses. Personal firearm use was alleged as to McGhee. It was also

4

alleged McGhee had two prior serious felony juvenile adjudications.  (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).)

Defendants were tried jointly before the same jury, which issued mixed verdicts.  The jury acquitted Higgs on the conspiracy count and deadlocked on all remaining counts for both incidents.  The jury acquitted Edwards on all counts related to the events on October 29, 2011.  The jury convicted McGhee of one count of assault, deadlocked on the attempted murder count and acquitted him of the remaining assault counts.

For the counts related to the October 31, 2011 robbery and shooting, the jury acquitted McGhee and Edwards of conspiracy to commit robbery but found them guilty on all other counts.  The jury also found true the robbery-murder special-circumstance allegation and all of the firearm allegations.

The court found true McGhee's prior conviction allegations and sentenced him to life without parole (LWOP), plus 209 years to life.

As to Edwards, who was 17 in October 2011, the court exercised its discretion pursuant to Penal Code section 190.5, subdivision (b) to not impose a sentence of life without parole on the murder count.  The court imposed a sentence of 53 years to life plus five years, calculated as follows:  25 years to life for the murder count, plus a consecutive one-year term for the firearm enhancement; consecutive terms of life with the possibility of parole, plus one year for the firearm enhancement on each of the four attempted murder counts.  The court imposed and stayed the sentences on the remaining counts pursuant to section 654.

McGhee and Edwards appealed.

## FACTUAL BACKGROUND

### 1.    Facts Prior to October 29, 2011

At the end of October 2011, McGhee, Edwards, Higgs, and Keyada Robinson were staying at Michelle Hudson's home in Santa Clarita.  (For clarity, we use the first names of individuals who share a common surname.)  At the time, all three defendants were 17 years old.  Higgs and Edwards were cousins, but McGhee "really didn't know" Edwards.  On October 28, 2011, McGhee showed Michelle's son Skyler a gun while Edwards and Higgs were present.

### 2.    October 29, 2011 Incident

On Friday night, October 28, 2011, Nikolas Gordian went to a party in Canyon Country and had an altercation with McGhee.  The next day—Saturday, October 29, 2011—McGhee and Gordian arranged to meet under a bridge to fight.  Gordian, his brother, and five friends went to the location, and McGhee arrived with Edwards.  (Gordian's friends did not recognize Edwards.)  McGhee and Gordian started to fight and McGhee displayed a black .32- or .38-caliber semiautomatic handgun.  McGhee fired one shot at Gordian which hit the ground near him.  According to statements from one of Gordian's friends to police, Edwards yelled, "Go blast that nigga," and McGhee again aimed at Gordian and yelled, "Shit.  I missed my shot."  (At trial, the friend denied ever making those statements.)  Gordian's group then ran off.

McGhee and Edwards returned to the Hudson home.  McGhee yelled at Higgs and Robinson for leaving them and complained that "someone he barely knew had his back when he had to do something," referring to Edwards.

### 3. Discussions of Committing Robbery

According to an interview with police, Robinson said McGhee, Higgs, and Edwards told him on Saturday, October 29, 2011, they wanted to "hit a lick," that is, commit a robbery. McGhee brought up the subject, and Edwards and Higgs discussed it, but not as much as McGhee did. Edwards was "always the quiet one"; he would "always be the one that will be, like, low-key in the background. Like, he's with it, like he's down to do it, but he'll always be the one in the background."

On Sunday, October 30, 2011, McGhee, Edwards, and Higgs "were trying to hit another lick."

### 4. October 31, 2011 Robbery and Shooting

On Monday, October 31, 2011, defendants left the Hudson house together around noon. McGhee wore a white sweatshirt. Higgs wore a white shirt with a large black logo and Edwards wore "something red," either a shirt or hat.

That afternoon, Rick Sandoval was walking near a strip mall in Canyon Country when Alejandro Sanchez-Torrez asked him for a dollar. Sandoval gave him the 35 cents he had on him. Sandoval lived in a nearby apartment complex. A dry river bed or "wash" separated the complex from the strip mall.

As Sandoval sat on a wall reading, a teenage African-American male wearing a white shirt approached him. (Because Sandoval's "primary memory" of the perpetrators was the color of their shirts, we refer to them in that manner.) As the male in the white shirt passed Sandoval, Sandoval asked if he would be interested in purchasing a Nintendo video game device. The male said he had a friend who might be interested and he would be back.

Several minutes later, the white-shirted male returned with two other African-American males, one in a red shirt and one in a black shirt. Sandoval did not have the Nintendo game device with him but said he would take $30 for it. The red-shirted male said he would give him $60. The white-shirted male said something like, "He's high" and "Don't listen to him." Sandoval asked if they had any "weed." The white-shirted male said he had a pound of marijuana. Sandoval asked for $10 worth. One of the males asked Sandoval for a lighter, so Sandoval gave him a green BIC lighter, and the males started smoking. At some point they asked if Sandoval had any money, and he said no.

Sandoval went to his apartment and got the Nintendo, a $20 bill, another lighter, and a marijuana pipe. When he returned, he handed the device to the males, who passed it around. They did not give it back to him. He overheard one of them whisper, "Let's do it fast." The white-shirted male then pulled out a small, grayish .22-caliber automatic gun, pointed it at Sandoval's face, and told him to put his hands up. Sandoval complied, although he thought the gun might be fake.

The white-shirted male ordered him down into the wash, and the three males followed. Sandoval stood against a wall with his hands up. At some point, he removed his wallet and held it in his hand. The white-shirted male told Sandoval to give them everything he had, and Sandoval started emptying his pockets. The white-shirted male told the others, "Go search this nigger." Sandoval responded that he did not have anything else. He handed his wallet over, and the black-shirted and red-shirted males searched him, but he was not sure if they took anything else.

As the two others walked away, the white-shirted male lowered the gun to Sandoval's chest, and Sandoval heard three clicks from the gun. The others returned, and one of them said, "Let's get this nigger." The red-shirted male said, "No man, you know, let him—." As the white-shirted male tried to fix the gun, Sandoval threw a rock. The others began throwing rocks, and Sandoval threw more rocks back. The white-shirted male said, "Let's go." The three males ran across the wash to the strip mall, and Sandoval chased them. The white-shirted male turned and pointed the gun at Sandoval and pulled the trigger several times. Sandoval zig-zagged to avoid any bullets, but the gun did not fire. At the top of the wash, the white-shirted male stopped, turned, and pointed the gun at Sandoval again. The three males were talking to each other and the white-shirted male was still trying to unjam the gun and shoot at Sandoval, who zig-zagged again.

The three males ran to a blacktop area. Two of them looked through Sandoval's wallet and one of them threw it on the ground. Sandoval continued to chase them, mostly because he was angry and wanted them caught. The three males stopped and faced Sandoval, cursing at him and calling him over. Sandoval fought them, and they all hit him. He fell to the ground and was kicked and hit in the head with what he thought was the gun. He fought back and called out for help. At some point, he was able to retrieve his wallet and the Nintendo game device.

Sanchez-Torrez, whom Sandoval had encountered earlier, was nearby with his seven-year-old son Anthony. Anthony saw the males beating up Sandoval, and Sanchez-Torrez said, "We're gonna go help him." He ran toward the group carrying Anthony's aluminum T-ball bat.

The white-shirted male pointed the gun at Sandoval again and pulled the trigger; the gun still did not fire. He then pointed it at Sanchez-Torrez and pulled the trigger. This time it did fire, shooting Sanchez-Torrez in the chest. He fell face down. The white-shirted male turned the gun on Sandoval and shot him in the leg. The three males fled in the same direction. Sandoval later identified them, although he was unclear about which color shirts they were wearing. He thought McGhee wore a black shirt, and Edwards and Higgs wore white shirts. Sanchez-Torrez died from the gunshot wound.

**5.      Post-murder Facts**

Around 3:20 p.m. on the day of the shooting, Los Angeles County sheriff's deputies responded to a dispatch call and detained Edwards and Higgs in a condominium complex near the crime scene. That evening, detectives interviewed Edwards, who told them he went to the wash wearing a red shirt and removed a cell phone from a Mexican male's pants pocket without his consent. He tossed the phone back because it was "weird." Shortly thereafter, he changed out of his red shirt at a nearby apartment complex. Detectives also interviewed Higgs, who told them he had gone to the wash wearing a black shirt and removed a marijuana pipe from a Mexican male's pants pocket without consent. He dropped the pipe. He also changed his shirt at a nearby apartment complex.

McGhee escaped immediate capture. Sweaty and out of breath, he ran to the home of his friend Joseph Perez-Coronel. According to Perez-Coronel's interview with police, McGhee displayed a "chrome-ish" "Deuce 5" gun and asked if Perez-Coronel wanted to buy it. Perez-Coronel heard a helicopter and "put the two and two together," asking McGhee, "[A]re they here

10

for you?"  McGhee replied, "[M]aybe."  Perez-Coronel asked McGhee to leave.

Later that evening, McGhee went to the home of another friend, Aaron Grandchamp, saying he needed a place to stay for the night.  He said he had been with Higgs and Edwards and had shot somebody at the wash.  He also said his mother had a plane ticket for him to go to Detroit.  Grandchamp let him stay overnight.  The next morning, he showed Grandchamp a small black gun, saying he needed to "stash" it.

That morning, McGhee and Grandchamp went to Michelle Hudson's house.  Michelle confronted McGhee, telling him Edwards and Higgs were in custody.  He "dropped his head" and looked at the ground.  She told him if he had any involvement in the murder, he needed to turn himself in.  He responded, "[T]his is not like camp.  This is bigger than camp."  At some point, Robinson referred to a news article and asked McGhee, "[I]t says somebody got killed.  What happened?"  McGhee responded, "Yeah, bro, I shot him."  McGhee left.

A detective spotted McGhee that afternoon walking about half a mile from the Hudson home.  When the detective attempted to detain him, he ran, although he eventually stopped.

At the scene of the shooting, officers found two .25-caliber shell casings, the game device, and Sandoval's wallet.  At the condominium complex where Edwards and Higgs were arrested, officers found Sandoval's green lighter, a red T-shirt in an area where Edwards had run, and two backpacks, one of which contained clothing and personal hygiene items.  Michelle gave police a .25-caliber shell casing she found in her backyard prior to the October 31, 2011 shooting.  Testing revealed it came from the

11

same gun as the casings found at the shooting scene.  Edwards and Higgs tested positive for gunshot residue.

In a recorded jail call, McGhee told his girlfriend to convey a message that Grandchamp should not testify against him.

**6.    Defense Case**

McGhee and Edwards did not present affirmative evidence in their defense.  Higgs called the sheriff's deputy who had interviewed Sandoval at the hospital after the shooting.  Sandoval told her that, after McGhee tried to shoot him the first time, Edwards and Higgs told him, "Let's just go."  Sandoval also told her McGhee asked him if he ever stole from anyone.  Sandoval said no, and McGhee responded, "Well, we do[,] a lot."

**DISCUSSION**

**1.    Edwards's Appeal**

**a.    Felony murder (count 1)**

The Legislature passed Senate Bill 1437 " 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*Lewis, supra,* 11 Cal.5th at p. 959.)

Senate Bills 1437 and 775 eliminated murder liability under a natural and probable consequence theory and narrowed liability for felony murder.  Penal Code section 188, subdivision (a)(3) now provides that "[e]xcept as stated in subdivision (e) of Section 189 [governing felony murder], in order to be convicted of murder, a principal in a crime shall act with

12

malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."

Subdivision (e) of Penal Code section 189 provides that a participant in the perpetration or attempted perpetration of a felony listed in subdivision (a), which includes robbery, in which a death occurs is liable for murder *only* if *one* of the following is proven:  (1) the person was the actual killer; (2) the person was not the actual killer, but, with the intent to kill, aided and abetted the actual killer in the commission of murder in the first degree; *or* (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in  section 190.2, subdivision (d).

At trial, Edwards and Higgs were prosecuted as accomplices of the shooter, McGhee.  It is undisputed the only theory of murder liability presented against Edwards, and the only theory on which the jury was instructed to find him guilty, was felony murder.  As such, the jury was instructed with CALCRIM No. 540B.  As relevant here, that instruction, while valid at the time it was given, allowed the jury to convict Edwards of felony murder even if he only intended to aid McGhee in committing robbery and without a finding he personally acted with the intent to kill or was a major participant who acted with reckless disregard for human life.

Respondent concedes that due to the postconviction change in the law, the felony murder instruction is no longer valid. Respondent argues however the error was harmless because the jury was also instructed with CALCRIM No. 703 regarding the robbery-murder special-circumstance allegation.  That instruction required the jury to find that Edwards either acted with intent to kill or was a major participant who acted with

reckless disregard.  Respondent says the jury, in finding the special circumstance true as to Edwards, necessarily found that Edwards acted with the requisite intent now required under the amended murder statutes.

But the trial here took place in 2014, before our Supreme Court issued its decisions *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 clarifying the law pertaining to accomplice liability for felony murder.  As relevant here, *Banks* said that for a nonkiller accomplice to be a major participant, the accomplice "must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Banks,* at p. 801.)  *Clark*, addressing the phrase reckless indifference, said the mere fact a robbery involves a gun, "on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life for the felony-murder aider and abettor special circumstance."  (*Clark,* at p. 617.)

Neither *Banks* nor *Clark* mandated changes to the felony-murder jury instructions.  But CALCRIM No. 703 was subsequently amended to include new language based on the nonexhaustive list of factors the Supreme Court discussed in *Banks* and *Clark* that may be relevant in accurately assessing nonkiller accomplice liability for felony murder.  While the factors are identified as optional, the Bench Notes to CALCRIM No. 703 state the trial court should determine if the optional bracketed paragraphs should be given and that those additional paragraphs should be given if requested by counsel.

The new language in CALCRIM No. 703 includes the following:  "[When you decide whether the defendant acted with

14

reckless indifference to human life, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant acted with reckless indifference to human life. Among the factors you may consider are: [¶] [• Did the defendant know that [a] lethal weapon[s] would be present during the <*insert underlying felony*>?] [¶] [• Did the defendant know that [a] lethal weapon[s] (was/were) likely to be used?] [¶] [• Did the defendant know the number of weapons involved?] [¶] [• Was the defendant near the person(s) killed when the killing occurred?] [¶] [• Did the defendant have an opportunity to stop the killing or to help the victim(s)?] [¶] [• How long did the crime last?] [¶] [• Was the defendant aware of anything that would make a coparticipant likely to kill?] [¶] [• Did the defendant try to minimize the possibility of violence?] [¶] [• <*insert any other relevant factors*>]].” (Jud. Council of Cal., Crim. Jury Insts. (2020 ed.) CALCRIM No. 703.)

On the issue of whether an accomplice qualifies as a major participant, the amended version allows for these additional instructions to the jury: “[When you decide whether the defendant was *a major participant*, consider all the evidence. No one of these following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant was a major participant. Among the factors you may consider are: [¶] [• [What was the defendant's role in planning the crime that led to the death[s]?] [¶] [• What was the defendant's role in supplying or using lethal weapons?] [¶] [• What did the defendant know about dangers posed by the crime, any weapons used, or past experience or conduct of the other participant[s]?] [¶] [• Was the defendant in a position to facilitate or to prevent

15

the death?] [¶] [• Did the defendant's action or inaction play a role in the death?] [¶] [• What did the defendant do after lethal force was used?] [¶] [• *<insert any other relevant factors.>*]]." (Jud. Council of Cal., Crim. Jury Insts., *supra*, CALCRIM No. 703.)

Respondent argues that *Banks* and *Clark* did not materially change the law regarding felony murder and focuses on the fact the amendments to CALCRIM No. 703 are optional. Respondent also relies on *People v. Farfan* (2021) 71 Cal.App.5th 942, 953–954 (*Farfan*) (denying resentencing relief, concluding Senate Bill 1437 made "the crime of felony murder subject to the same elements of proof required for a special circumstance finding").

But *Farfan* did *not* involve a pre-*Banks* and *Clark* special-circumstance finding. The trial there took place after both decisions had been issued clarifying the law of felony murder. (*Farfan*, *supra*, 71 Cal.App.5th at pp. 955–956.)

Our Supreme Court is currently considering the issue of whether a pre-*Banks* and *Clark* special-circumstance finding is a categorical bar to relief under Penal Code section 1170.95. (*People v. Strong* (Dec. 18, 2020, C091162) [nonpub. opn.], review granted Mar. 10, 2021, S266606.)

Pending guidance from the Supreme Court, we conclude the jury's true finding on the robbery-murder special-circumstance allegation is not a categorical bar to relief. We therefore must assess the instructional error caused by the postconviction change in the law. Instructional error based on a misdescription or omission of an element is subject to harmless error analysis under the test set forth in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Mil* (2012) 53 Cal.4th 400, 409,

16

415-417 (*Mil*) [reversing burglary-murder and robbery-murder special-circumstance findings]; accord, *Neder v. United States* (1999) 527 U.S. 1, 4.)

*Mil*, relying on *Neder*, instructs that a reviewing court should " 'conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' [Citation.] On the other hand, instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' " (*Mil*, *supra*, 53 Cal.4th at p. 417.) We must decide " 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' " (*Ibid.*)

The evidence summarized above does not convince us beyond a reasonable doubt that Edwards acted with intent to kill or was a major participant who acted with reckless disregard to human life. We therefore reverse Edwards's conviction for the murder of Sanchez-Torrez in count 1. The parties agree, as do we, that on remand the prosecution may retry Edwards for murder on a legally valid theory. Where, as here, a postconviction change in the statutory or decisional law invalidates the theory upon which a conviction is based, the prosecution may retry the defendant on a legally valid theory. (See, e.g., *People v. Chiu* (2014) 59 Cal.4th 155, 168 (*Chiu*).)

Because we reverse the murder conviction, defendant's other arguments challenging his murder conviction are moot, including his challenge to the sentence imposed.

### b.  Attempted murder (counts 2, 3, 12 & 17)

Respondent concedes that a reversal on the attempted murder counts is warranted because of the postconviction change in the law.  We agree.

It is undisputed the jury was instructed that Edwards could be found guilty of attempted murder based on the natural and probable consequences doctrine, a theory of liability that is no longer valid in light of the passage of Senate Bills 1437 and 775.  (Pen. Code, § 188, subd. (a)(3); see also *People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)  While the jury was also instructed with direct aiding and abetting principles, the record demonstrates the prosecution primarily relied on the natural and probable consequences theory of liability.

This error is also subject to the harmless error test set forth in *Chapman*.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 9.)  "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id.* at p. 13.)

Respondent concedes the record here does not show beyond a reasonable doubt the jury did not rely on the invalid theory in finding Edwards guilty.  While the jury found true the allegation the attempted murders were willful, deliberate and premeditated, the jury was instructed with CALCRIM No. 601 which told the jury it could find true the premeditation allegation if "either the defendant or the principal" acted with the requisite state of mind.  Therefore, the premeditation findings are

18

insufficient to conclude the error was harmless beyond a reasonable doubt.

All four of the attempted murder convictions must be reversed. Because we reverse based on a postconviction change in the law, the prosecution, on remand, may retry Edwards on a legally valid theory. (*Chiu, supra*, 59 Cal.4th at p. 168.)

Edwards's remaining arguments challenging his attempted murder convictions are moot.

### c. The claimed evidentiary error

In his original briefing, Edwards raised a claim of evidentiary error. The argument is arguably relevant to the robbery and assault convictions which we affirm and therefore is not mooted by our reversals on the murder and attempted murder counts.

Edwards argued the trial court abused its discretion and violated his constitutional right to present a defense when it excluded the following statement Robinson made to police about what Edwards told McGhee and Higgs on the morning of the robbery and murder: "So then on Monday, Monday morning . . . Brandon [Higgs], Tay [McGhee], and Eric [Edwards]—Eric was the one who did not want to go. Eric was the one who did not want to go. Eric wanted to stay. I know Eric wanted to stay. Eric's like, 'bro, I'm not about to roll with ya'll. I already know what ya'll about to do, I'm not about (to) go.['] " Respondent argues the court did not exclude this statement; defense counsel simply abandoned any effort to introduce it while cross-examining Robinson. After reviewing the record, we agree.

It appears the court would have allowed Robinson to testify that Edwards made the "I'm not about to roll with ya'll" statement. Before trial, the court expressly permitted the

19

defense to offer the statement. During a sidebar at trial, when Edwards's counsel argued he was saying he did not want to go, the court responded, "I think that has to come in, to some degree, the fact he didn't want to go, but ultimately did go." At the conclusion of the sidebar, the court stated its rulings stood, which reasonably referred to its pretrial ruling admitting the "roll with ya'll" statement. When questioning resumed, the prosecutor only objected to the question asking Robinson about Edwards's intent—whether he actually did not want to go. The court seems to have understood that when it directed Edwards's counsel to rephrase the question. Whether it was a misunderstanding or a tactical decision, it appears Edwards's counsel simply chose to not ask Robinson about the statement during cross-examination. Thus, because the court never excluded the "roll with ya'll" statement, it could not have done so incorrectly, and Edwards's argument fails.

## 2. McGhee's Appeal

McGhee did not petition the Supreme Court for review. However, in transferring this case to us, the Supreme Court directed us to vacate our prior decision. Having vacated our prior decision in its entirety, we address McGhee's original contentions and once again affirm his convictions, finding no reversible error.

### a. *Aranda/Bruton* error

McGhee argues the trial court's admission of redacted statements by Edwards and Higgs to police violated *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123. We disagree.

Citing *Bruton* and *Richardson v. Marsh* (1987) 481 U.S. 200 (*Richardson*), the prosecution moved before trial to introduce redacted statements Edwards and Higgs separately made to

20

police, with the limitation those statements would only be introduced against those defendants respectively and no other defendant. Edwards's redacted statement stated as follows: "Mr. Edwards was interviewed at the Santa Clarita Sheriff's Station on the evening of 10/31/11. I advised him of his *Miranda* [*v. Arizona* (1966) 384 U.S. 436] rights (description of rights omitted) and he agreed to speak with me. Mr. Edwards stated that he went to the wash on 10/31/11. Mr. Edwards stated that he wore a red shirt. He approached a Mexican male and removed a cell phone from the Mexican male's pants pocket without the Mexican male's consent. Mr. Edwards stated that he then tossed the phone back to the Mexican male because the phone was a 'weird' 'Boost' phone. Mr. Edwards admitted that he changed out of his red shirt while at an apartment complex a short distance away a short time later." Higgs's statement said as follows: "Mr. Higgs was interviewed at the Santa Clarita Sheriff's Station at 12:11 am on November 1st. Higgs stated that his date of birth was 8/15/94. I advised him of his *Miranda* rights (description of rights omitted) and he agreed to speak with me. Mr. Higgs stated that he went to the wash on 10/31/11. Mr. Higgs stated that he wore a black shirt. Higgs admitted that, while at the wash, he removed a marijuana smoking pipe from a Mexican male's pants pocket without the Mexican male's consent. Higgs stated that he dropped the pipe onto the ground shortly thereafter. Higgs stated that he later changed his shirt at a nearby apartment complex."

At a hearing on the motion, McGhee's counsel noted he had filed a severance motion based on the statements from Higgs and Edwards and argued that such statements could not "be redacted and not inculpate" McGhee, so McGhee could not get a fair trial if

21

they were admitted.  The court disagreed and admitted the redacted statements, finding there was no reference to any other defendant or even mention of "we" or "they."  The statements also did not shift blame to anyone else.  For those reasons, the court also denied McGhee's motion to sever.

During opening and closing arguments, the prosecutor repeatedly told the jury it could only use the statements against the individual who made them and not against the other defendants.  Likewise, before the statements were introduced and during formal instructions, the court instructed the jury it could only use the statements against the individual who made them and no one else.

Under *Aranda* and *Bruton*, a " ' " 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' " ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 869, overruled in part on other grounds as stated in *People v. Hardy* (2018) 5 Cal.5th 56, 103.)  The rule does "not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial." (*Capistrano,* at p. 869, citing *Richardson, supra*, 481 U.S. at pp. 206–207.)  Thus, "admission of a nontestifying codefendant's confession against the defendant does not violate the defendant's confrontation right if the confession is redacted to eliminate not only the defendant's name but any reference to his existence. [Citation.]  'When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession

22

the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause.'" (*Capistrano, supra*, at p. 869.)

The statements admitted by the court plainly did not violate *Aranda* and *Bruton* because, as the trial court recognized, they did not refer to McGhee's existence in any way. They did not even use pronouns like "we," "us," "they," or "them" to suggest the presence of any other individual at the robbery. While the statements might have incriminated McGhee when linked to other evidence, that does not render the statements improper under *Aranda* and *Bruton*. Further, both the prosecutor and the court told the jury repeatedly it could only use each statement against the defendant who made it and no one else. Under these circumstances, we find no error.

### b. Request to excuse jurors and for mistrial
#### i. Procedural background

McGhee contends the trial court deprived him of an impartial jury when it refused to excuse three jurors during deliberations or declare a mistrial after one juror expressed concern someone might have been photographing them in the courthouse parking lot. We disagree.

During deliberations, the trial court advised counsel the court clerk received a call from Juror 2, who said as she was leaving the courthouse the previous day a female in a black Toyota sedan took photographs of her leaving the parking lot. The incident upset her and she spoke to Jurors 8 and 3 about it. She also had someone else drive her to court the next day.

The court separately interviewed Jurors 2, 3, and 8 about the incident. Juror 2 explained to the court:

23

"[A]s I was pulling out, a little bit to my right there was a black Toyota sedan, and as I was looking to my right I noticed a hand came out of the car. And to me it looked like it was a cell phone, and it looked like it was pointed right at my car. So it would be directly facing the front of my car. And I thought, did I just imagine that or am I paranoid? So I drove home.

"I looked around to see if I was being followed. No. Got to my daughter's school. And I called Juror number eight. I don't have everybody's number, just eight and the alternate. And I said, did you notice anything funny when you were driving out of the parking lot? Yeah, there was a black car taking selfies. I said, 'Are you sure they were taking selfies, because I thought the camera was pointed to me.' And she said, 'I left after you and thought they were taking selfies.'

"So she called Juror no—sitting next to me, Juror number three. And Juror number three said, yes, she saw the phone come out of the car, and she saw it flash. And she asked her, 'Do you think it was a selfie?' And she said, 'It looked like the flash was towards me.' And also one of the other jurors, the guy, I don't know what number he is, he said that when he was pulling out [of] the parking lot, he also saw the phone come out, but he thought they were taking selfies. So they thought they were taking a lot of selfies, and we are paranoid. So somebody is taking pictures of us, my car, my license."

The court asked Juror 2 if she recognized the person, and she said, "All I know, it was a female. I didn't notice anything else. I don't know if I saw hair or how I know it was a female, but the other two jurors also said it was a female." The court informed her it would tell the other jurors it would provide escorts at lunch and asked her to follow the law and give both

sides a fair trial. Juror 2 asked if there were cameras in the parking structure, and the court responded, "[E]verything will be looked into. But what I need you to do is not hold that against any party. We don't know if they were selfies. You don't know who it is associated with. It could be just someone taking photographs. You have no idea if it relates to any of the parties involved. Correct?" Juror 2 responded, "Correct." The court finished, "So what I will ask you to do is set this aside and be fair to all sides. Can you do that?" Juror 2 responded, "Correct. As long as I feel like I'm safe here." The court said, "We'll make sure that you feel safe." Juror 2 responded, "Okay." She then agreed not to discuss the issue with other jurors.

Juror 8 told the court: "I was starting to leave. I noticed that there was a person sitting in the car. It was an all black car, and the window was down. Their arms were out the window. You couldn't see their faces. And they had like a cell phone camera, so I thought—at first I didn't think too much. I thought they are taking selfies. But usually you would see somebody's face or something. It just kind of—I didn't really think too much of it, except that it was just strange that the camera was outside of the car, like almost all the way outside the car, and I knew there was somebody else in the car with her. It was a young girl. That much I do know. Skinnier arms. Kind of olive complexion. [¶] And as I made a right-hand turn, I just thought, okay, teenager taking selfies. Didn't really think much of it. Kept going. Then I received a phone call from Juror number two. And she asked me, 'Did you notice a girl in the black car taking pictures of our cars?' And I said I didn't know if she was taking pictures of her or us, and I told her—"

25

The court asked, "You thought they were possibly selfies?" She responded, "I thought possibly selfies. And I thought—but that is strange she saw it too. And she left after I did, probably like four or five minutes after I did. I think I was out, you know, way before her because she was still talking to two other jurors in the parking lot when I was leaving. And so I thought, well, that's kind of a long time to wait—or a long time to be taking selfies. [¶] So then I called another juror and asked if she saw it, and she said, yes. And I said, 'Did you think they were taking selfies?' And she said, well, the only thing that was strange to her was the flash was going back or was not going back into the car, the flash was coming out of the car." The court asked, "So at this point you don't know who it was. Correct?" Juror 8 responded, "No. Absolutely. I never saw the face. I could definitely identify it was a female. There was probably a ring or something on the finger. But just the shape of the arms, it was definitely a female." The court again inquired, "You thought they might have been doing selfies?" Juror 8 responded, "Yes," and added, "I'm not a hundred percent sure they were taking pictures of our cars."

The court asked Juror 8 to set the matter aside, and she responded she could do that and be fair to both sides. The court instructed her to follow the law, and she responded, "Absolutely." The court asked if she had any "issues," to which she responded, "I do not have a problem with that." She asked for an "[e]scort, maybe, when we leave," and the court said it may be able to arrange that. She said her husband dropped her off that morning "just to play it safe." The court asked if she attributed the incident to anyone, and she said, "Absolutely not." She then agreed not to discuss the issue with anyone.

Juror 3 told the court: "I was behind a black truck, and there was a car on my left-hand side with a female that had stuck her hand out the window with a cell phone. I only saw a flash go off. It could have been a reflection or flash, but it wasn't towards my car. I saw it towards the black truck in front of me. I thought that was kind of odd somebody is taking pictures, but I can't say it was of myself. It was probably of the car in front of me." She added, "[T]here was somebody else in the passenger seat, but he wasn't paying attention to what she was doing." She said she did not recognize the person and "couldn't tell" if they were taking a photograph of themselves. She saw "the phone out the window with the flash that went off."

The court instructed her to disregard the incident. She said she could follow that instruction and give all sides a fair trial. She would not be affected by the incident in any respect. When asked if she had spoken to other jurors, she said, "I spoke with Juror number eight. She actually is the one that called me yesterday. She asked if I had recognized something unusual. That's the person I had the first contact with. And, yes, we were talking about it out there. I'm not going to lie and say we are not." The court asked, "Just generally among the jurors there was a possible photograph[] taken yesterday?" She responded, "Correct. That was it. We didn't debate about what it was indicating, just recognize there was a car and a female who was taking pictures." She indicated she would not discuss the issue with other jurors.

McGhee's counsel asked the court to excuse Jurors 2, 3, and 8 for cause. Edwards's and Higgs's counsel also moved for a mistrial, which McGhee's counsel later joined. The court denied the mistrial, explaining, "I spoke to Jurors two, eight and three

and conducted extensive questioning of them.  All of them were somewhat unclear as to what occurred.  One thought possibly it was selfies.  They all indicated it was somewhat suspicious.  They were unable to link it to anyone involved in this case whatsoever.  They all indicated that they could put it aside and be fair to all sides."  The court denied the request to dismiss any jurors "in light of the fact there is no good cause shown, and in light of the responses of the jurors indicating they could be fair and follow the law."

The court admonished the full jury:  "Ladies and gentlemen of the jury, it has come to my attention of an incident regarding a cell phone that occurred yesterday in the parking lot.  At this point there is no evidence that it is connected with anyone involved in this case.  I'm going to be ordering you to disregard anything you may have heard or saw about the incident.  At this point, you are also ordered not to further discuss this matter.  I'm also going to instruct you, you are not to consider this incident for any reason whatsoever, and not let it affect your deliberations in any way.  [¶]  Also, just as an abundance of caution, the court is going to provide escorts after lunch, or at the time of lunch, and when you leave the courtroom.  So that'll be provided for you.  So, again, you must not consider this incident for any reason whatsoever, and not let it affect your deliberations in any way."  The court asked if anything would prevent the jurors from being fair and impartial, and no juror raised a hand.

Later, McGhee's counsel augmented the record as follows: "Description by one or more of the jurors was they saw a dark-colored car and an arm extended outside, one of the jurors said, and was using two arms to extend outside the car.  And one of the jurors described that arm, olive-colored arm, and I'm sure the

court has figured out Mr. Higgs had his sister in court, a young African American female, and McGhee's family has had Mr. McGhee's sister in court, a young African American female. So the concern is that any perception of something being done against a juror I think would be more against the defense than certainly the prosecution. So I wanted to augment the record with that because, absent that, anybody reviewing this record would not know those people were in the courtroom."

The prosecutor responded: "As I think we've all been able to observe, but the record would be silent on this issue, but throughout this trial there have been a number of audience members. I think that there may have been a couple that were not African American, but I believe that the rest were African American, most of whom are very dark complected. There are some of the audience members that are lighter skinned, but I couldn't classify any of them as being olive-skinned individuals. [¶] So my feeling is that nobody in the courtroom, nobody in the audience will be classified as having olive skin, and therefore will not be potential suspects in the photographing. Additionally, I believe that the jurors, when questioned, stated that they did not identify anybody, they did not identify the photographer, so to speak, as being anybody associated with this case, and I assume—I think the implication was clear that included audience members."

The court again denied the mistrial motion for the reasons previously explained on the record. The court noted Juror 2 "did appear to be upset; however, she did indicate she would be able to follow the court's orders and directions and would be able to continue to be a juror."

### ii. Analysis

A criminal defendant has a constitutional right to trial by an impartial jury, so a "juror's misconduct or involuntary exposure to certain events or materials other than what is presented at trial generally raises a rebuttable presumption that the defendant was prejudiced and may establish juror bias." (*People v. Merriman* (2014) 60 Cal.4th 1, 95; see *People v. Harris* (2008) 43 Cal.4th 1269, 1303 (*Harris*) [" '[T]ampering contact or communication with a sitting juror . . . usually raises a rebuttable "presumption" of prejudice.' "].)  That presumption may be rebutted and the verdict left undisturbed "if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant.  [Citations.]  Our inquiry in this regard is a 'mixed question of law and fact' subject to independent appellate review.  [Citation.]  But ' "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*Merriman, supra*, at p. 95.)  "An admonition by the trial court may also dispel the presumption of prejudice arising from any misconduct." (*People v. Tafoya* (2007) 42 Cal.4th 147, 192–193.)

It is not clear on this record whether the photographing incident recounted above related to the trial here or any of the participants, so we are hesitant to conclude there was any misconduct that might have tainted the jury.  But even if it constituted misconduct raising a presumption of prejudice, that presumption was rebutted because the record demonstrates there was no substantial likelihood any juror was actually biased against McGhee.  The trial court extensively questioned Jurors 2,

30

3, and 8 about the incident, and none of them recognized the person with the cell phone taking photographs or could even be certain she was taking photographs of them. If she was, none of the jurors attributed her conduct to either the prosecution or any of the defendants. And all of them affirmed they could set the incident aside and judge the case impartially, even if Jurors 2 and 8 expressed some desire to "play it safe" with a court escort outside the courtroom. (See *Harris, supra*, 43 Cal.4th at p. 1304 [courts may rely on statements from jurors that event would not affect deliberations].) Further, the court admonished the entire jury not to consider the incident or let it influence deliberations in any way, and no juror expressed any reluctance in doing so. Thus, the court properly denied a mistrial and properly declined to excuse any jurors.

### c.    Challenge to sentence

McGhee briefly contends the trial court failed to make an adequate record under *Miller v. Alabama* (2012) 567 U.S. 460, 465 before sentencing him to LWOP as a juvenile. McGhee's appellate counsel complained he made repeated requests to augment the record but never received the transcript of McGhee's sentencing. As respondent points out however, it appears the record was augmented with that sentencing transcript on July 8, 2015. We do not know why McGhee's appellate counsel was unaware the transcript had been added to the record. In any case, we decline respondent's invitation to summarily reject McGhee's contention and will review the merits.

We find the record here adequate to support McGhee's LWOP sentence.

*Miller* requires a sentencing court, "in exercising its sentencing discretion, to consider the 'distinctive attributes of

31

youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1361 (*Gutierrez*).)

Those attributes include (1) a juvenile offender's " 'chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences' "; (2) "any evidence or other information in the record regarding 'the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional,' " including "evidence of childhood abuse or neglect, familial drug or alcohol abuse, lack of adequate parenting or education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance"; (3) "any evidence or other information in the record regarding 'the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him' "; (4) "any evidence or other information in the record as to whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys' "; and (5) "any evidence or other information in the record bearing on 'the possibility of rehabilitation,' " including the extent or absence of criminal history. (*Gutierrez, supra*, 58 Cal.4th at pp. 1388–1389.)

Here, as the court noted at sentencing, McGhee was facing a third strike sentence because the jury found the prior conviction allegations true. The prosecutor argued for an LWOP sentence because McGhee "not only murdered somebody and permanently injured somebody else, but he got two other people involved that probably never would have been involved in something like this. And one of them was a close friend of his, and he really destroyed that person's life. He got another person he barely knew involved, and completely destroyed that person's life—[.]" McGhee interjected at that point: "They grown men." The prosecutor continued, "This defendant caused so much pain to so many people; pain that'll not go away. Anthony Sanchez [(Sanchez-Torrez's son)] will never have a father. [Rick] Sandoval will never be the same. This defendant has behaved in such a callous fashion over a period of time. He shot at Nickolas [*sic*] Gordian under a bridge. He conducted himself with such a wanton and reckless disregard for human life. He's a danger. And throughout this process I've not seen one wit [*sic*] of remorse from him. Not any."

McGhee's counsel responded, "[T]his is a young man who was 17 at the time. 17. And I don't know if counsel remembers his youth. I have a clear recollection of mine. It's just a matter of luck that I didn't get in a lot of trouble when I was 17. 17-year-olds are not adults. They do things impulsively. They don't think things out. Their mind is not fully developed. They are going through a lot of emotional changes in their body, and they act out differently. [¶] Teenagers are treated differently because they are not adults. They're not—and to say that a 17-year-old should be held when he is kept in prison at the expense of the state until he is my age or older is a crime in itself, in my opinion. In fact,

the case law—there is a decision now that says minors should not get life without possibility of parole because we've had cases where the person had life without the possibility of parole, comes back to court and the sentence has been reduced because the sentence must not be life without the possibility of parole. It is cruel and unusual punishment. It is punishment for a crime for actions of a child. [¶] To say that—I don't know whether [the prosecutor] had any private conversations with my client. To make the determination that he doesn't have any feelings of remorse for his actions is a statement without any basis. Once again, we can do something. We're here to act in a mature way, and mature adults should not treat a child like an adult and give them life without the possibility of parole."

The prosecutor pointed out McGhee had just called Edwards and Higgs "grown men," when they were the same age as he was when they committed the crimes. So McGhee "is saying that for all intents and purposes everybody was functioning as grown men and they were acting with the full cognizance of what was going on. This defendant knew what he was doing and he needs to be locked up forever."

In sentencing McGhee, the court expressly recognized the requirements of *Miller*: "Looking at the cases regarding determining whether the defendant will get an L.W.O.P. sentence or life, when a court elects to sentence a juvenile offender to life without parole for homicide offense, the court must weigh the applicable factors set forth in the [*sic*] *Miller v. Alabama*. And the [*sic*] *Miller v. Alabama* holds that a mandatory life of imprisonment without parole for those under the age of 18 at the time of their crime violates the Eighth Amendment prohibition on cruel and unusual punishment."

34

The court continued, "*Miller* does not bar punishment of L.W.O.P. for minors, but it does determine that the sentencing court must consider various factors set forth in the *Miller* decision, and in this matter the court has considered the *Miller* factors in reaching his conclusion. In this case, the facts of the case—and, again, I'm not going to go through each one of the *Miller* factors, but I have reviewed them and considered them in my sentencing. [¶] The various facts of the actual incident, just for the record, is that the defendant arrives with a weapon. He goes to rob an individual with an accomplice. Fires the weapon multiple times at a robbery victim. When a good Samaritan comes to the robbery victim's aid, that good Samaritan is shot. The good Samaritan falls and dies right in front of his young son who sees his father die in front of him. The defendant then again turns the gun on the robbery victim and fires a weapon. [¶] But for the fact that gun misfired, this would be a double murder. The defendant has showed a conscious disregard for human life, and I do believe that this is one of those rare occasions where the factors set forth and the type of the crime reflects [an] irreparable degree of corruption and harm, and it's just an egregious crime. So I do believe an L.W.O.P. sentence is appropriate, given the *Miller* factors. I have considered them."

This record satisfies *Miller*. Although the court did not expressly discuss all the *Miller* factors, McGhee's counsel argued that his immaturity and impulsivity counseled against an LWOP sentence. The court considered and rejected that argument, finding the egregiousness of the crime demonstrated an irreparable degree of corruption that justified treating McGhee as an adult subject to an LWOP sentence. Having recognized its discretion under *Miller*, the court acted well within that

35

discretion in finding McGhee's actions in convincing two accomplices to commit a robbery that led to McGhee's cold, callous murder of an innocent bystander attempting to help the robbery victim was one of those "rare occasions" justifying an LWOP sentence.

## DISPOSITION

The judgment of conviction as to Diamonte Jerome McGhee is affirmed.

The judgment of conviction as to Eric Michael Edwards is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion. The convictions for murder (count 1) and all four attempted murders (counts 2, 3, 12 & 17) are reversed. The robbery-murder special-circumstance finding and all findings and enhancements associated with counts 1, 2, 3, 12 and 17 are reversed. In all other respects, the judgment of conviction is affirmed.


GRIMES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.